**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| CROWN TRANSPORTATION, INC., a corporation, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )   No. 06-CV-590-TCK-PJC<br>) |
| SMITH SYSTEMS TRANSPORTATION, INC., a corporation, | )<br>)<br>) |
| Defendant. | )<br>) |
| and | )<br>) |
| SST FINANCIAL GROUP, LLC, formerly AES FINANCIAL GROUP, LLC, | )<br>)<br>) |
| Intervening Plaintiff, | )<br>) |
| v. | )<br>) |
| CROWN TRANSPORTATION, INC., a corporation, | )<br>)<br>) |
| Defendant. | ) |

**OPINION AND ORDER**

Before the Court is Defendant Smith Systems Transportation, Inc.'s Motion for Summary Judgment (Doc. 39). For reasons explained below, this motion is denied.

**I.    Background**

Defendant Smith Systems Transportation, Inc. ("Smith") is an interstate motor carrier based in Nebraska which transports freight nationwide. In conducting interstate transportation, Smith uses its own equipment and also enters into agreements with other companies to use their equipment. In 2002, Smith entered into such an agreement with Plaintiff Crown Transportation, Inc. ("Crown").

1

Crown, an Oklahoma corporation, is owned one-hundred percent by Charles W. Crafton ("Crafton"). The agreement between Smith and Crown is entitled "Terms and Conditions of the Business Relationship Between [Smith] and [Crown]" and is referred to by the Court as the "Agreement." (*See* Am. Compl., Ex. A.) The Agreement was for a term of three years, with automatic one-year renewals unless terminated by either party. The Agreement specifies that Crown is an independent contractor and that neither Crown nor any of its agents are employees of Smith.

The Agreement provides that Smith shall lease equipment from Crown. As compensation, Smith was to pay Crown eighty-five percent of the "line-haul rate" for each load transported in the leased equipment and ninety percent of any "assessorial charges" invoiced and collected.[1] In addition, Smith was to pay Crown one-hundred percent of all fuel surcharge and stop pay invoiced, to be disbursed to the "owner operators" of the vehicles. The Agreement further provides that (1) if a Smith-owned truck transports a load for Crown during the terms of the Agreement, Smith is to pay Crown a five-percent referral fee of the truck rate collected for each customer; (2) Smith is to provide Crown waste permits, liability insurance, and other items for services provided by Smith to Crown; and (3) Crown shall provide Smith with new customers, new transportation lanes, sales and customer service assistance, collection assistance for new customers introduced by Crown, and "invoicing services" set out in Appendix A to the Agreement ("Appendix A").

Appendix A, which is entitled "Accounts Receivable Funding," provides that Crown will invoice its customers and send all copies of their invoices to AES Financial Group, now known as SST Financial Group ("SST Financial"). SST Financial, which is referred to in Appendix A as a

---

[1] These percentages varied in some instances based on whether Smith or Crown provided a "Van trailer" for the trip and whether Smith provided a "Roll Off or Tanker" to Crown.

factoring company, was to pay Crown eighty-four percent of received and approved invoices. The other one percent of the contracted eighty-five percent would be matched by Smith and put in an escrow account held by SST Financial for "non-performing" customers. The purpose of the account was to protect against "slow and non-paying customers." Appendix A references a separate factoring agreement between SST Financial and Crown, which is not part of the record.

Smith and Crown operated pursuant to the Agreement from 2002 until January 2005. On October 24, 2006, Crown filed this lawsuit alleging three causes of action against Smith. First, Crown alleges that Smith breached the Agreement by failing to pay money due and owing to Crown and failing to properly account for such money. Second, Crown alleges that the Agreement fails to comply with federal regulations promulgated pursuant to the Truth in Leasing Act, 49 U.S.C. § 14704, *et seq.* ("TLA") and its accompanying regulations, 49 C.F.R. Part 376 ("TLA Regulations"). Specifically, Crown claims that the Agreement omits required provisions and contains provisions that are in conflict with TLA lease requirements set forth at 49 C.F.R. § 376.12(a)-(m).[2] Crown's third cause of action is related to Appendix A and the escrow account referenced therein. Crown alleges that Smith has refused to return escrowed monies, has failed to properly account for escrowed monies, and has therefore failed to comply with 49 C.F.R. § 376.12(k), which sets forth certain requirements when escrow funds are required by a lease. As part of Count Three, Crown also alleges that Smith committed actual and constructive fraud under Oklahoma law.

On December 5, 2006, Smith asserted one counterclaim against Crown for breach of contract

---

[2] In the Amended Complaint, the second cause of action references 49 C.F.R. § 1057(a)-(m). (Am. Compl. ¶ 15.) The Court was unable to locate a regulation at 49 C.F.R. § 1057, nor do the parties mention this regulation in their briefs. It appears that Crown intended to refer to 49 C.F.R. § 376.12(a)-(m), which sets forth the requirements for TLA leases, and the Court construes the Amended Complaint accordingly.

and unjust enrichment. This claim is for breach of agreements between Smith and Crown whereby Smith agreed to assist Crown in maintaining cash flow by providing Crown with various cash advances. These were tracked by Smith in accounts labeled as a "fuel advance account," for which Smith alleges Crown owes over $65,000, and a "Crown needs account," for which Smith alleges Crown owes over $75,000. In addition, Smith claims that Crown stranded drivers and left Smith to pay back wages to Crown employees, as well as road and fuel taxes. Smith did not attach any written documents in support of its counterclaim, and the Court assumes these cash advances and alleged agreements to repay were oral agreements.[3]

On February 12, 2007, approximately four months after Crown filed this lawsuit, Crafton and his wife, Linda Jean Crafton, filed a Voluntary Petition for Chapter 13 bankruptcy ("Bankruptcy Petition") in the United States Bankruptcy Court for the Western District of Oklahoma, Case No. 07-10425 NLJ ("Bankruptcy Case").[4] On February 20, 2007, the Craftons filed a proposed Chapter 13 Plan, which was confirmed by the bankruptcy court on May 23, 2007.

On February 22, 2008, Smith filed the motion for summary judgment that is now before the Court. Smith makes two arguments in support of its motion: (1) Smith is entitled to judgment on all claims because Crown is judicially estopped from bringing this lawsuit due to misrepresentations and omissions made by Crafton in his Bankruptcy Case; and (2) Smith is entitled to judgment on

---

[3] On May 3, 2007, SST Financial filed a Complaint in Intervention against Crown, making identical allegations as those alleged by Smith in its counterclaim.

[4] Crafton claims Smith's failures to pay Crown, as alleged in this lawsuit, forced him into personal bankruptcy. (*See* Crafton Aff., Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. D at ¶¶ 10-11 ("Smith's failure to comply with the agreement and the leasing regulations forced me into personal bankruptcy. Smith ended up with my drivers and my customers and I ended up bankrupt.").)

4

Crown's second and third claims for TLA regulatory violations because the Agreement is not covered by TLA Regulations.[5]

On March 6, 2008, following Smith's assertion of its judicial estoppel argument, the Craftons filed certain amendments to their Bankruptcy Petition in the Bankruptcy Case. These amendments disclosed, for the first time, this lawsuit as a potential asset of the Craftons' bankruptcy estate. (*See* Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. E.) On March 17, 2008, the Trustee administering the Craftons' Bankruptcy Case sent a letter to counsel for Crown in this lawsuit. The letter stated that the Trustee does not object to prosecution of this lawsuit, so long as the Trustee is kept apprised of its status. (*See id.*, Ex. F.)

## II.     Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006) (citation omitted). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.* (citation omitted). However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential

---

[5] Originally, Smith also argued that Crown's claims were barred because Crown was not a viable corporation under Oklahoma law. However, Crown has since received a Certificate of Good Standing from the Oklahoma Secretary of State (*see id.*, Ex. B), and such argument is moot.

to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

### III. Discussion

#### A. <u>Judicial Estoppel</u>

Judicial estoppel is a "*discretionary* remedy courts may invoke to prevent improper use of judicial machinery." *Johnson v. Linden City Corp.*, 405 F.3d 1065, 1068 (10th Cir. 2005) (emphasis added) (quotation omitted).[6] Judicial estoppel is based on the principle that when "a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Id.* at 1069. (quotation omitted). Although not "reducible to any general formulation or principle," there are three factors that courts typically consider in determining whether to apply judicial estoppel. *Id.*

> *First*, a party's later position must be clearly inconsistent with its earlier position. Moreover, the position to be estopped must generally be one of fact rather than of law or legal theory. *Second*, whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. The requirement that a previous court has accepted the prior inconsistent factual position ensures that judicial estoppel is applied in the narrowest of circumstances. *Third*, whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* (emphasis added) (citations and quotations omitted). Unlike equitable estoppel, judicial estoppel does not require detrimental reliance by the party asserting estoppel. *In re Riazuddin*, 363 B.R. 177,

---

[6] At one time, the Tenth Circuit refused to apply the doctrine of judicial estoppel but has since authorized the doctrine's use based on Supreme Court precedent that "altered the legal landscape." *Id.*

6

185-86 (B.A.P. 10th Cir. 2007).[7] This is because "judicial estoppel is designed to protect the integrity of the court system, not any individual litigant." *Id.* at 186.

In this case, Smith alleges that certain omissions and/or misrepresentations in the Craftons' Bankruptcy Petition estop Crown from filing this lawsuit. Specifically, Smith claims that Crafton (1) failed to disclose his ownership in Crown when asked to list his "stock and interests in incorporated and unincorporated businesses" (*see* Bankruptcy Petition, Def.'s Mot. for Summ. J., Ex. 4 at Schedule B, #13); (2) failed to disclose this lawsuit when asked to list "all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case" (*see id.* at Statement of Financial Affairs ("SOFA") #4); and (3) failed to accurately or completely disclose the existence of Crown Transportation, Inc. as a separate corporation owned by Crafton when asked to "list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, or partner, or managing executive in a corporation . . ., sole proprietor, or was self-employed in a trade . . . ." (*see id.* at SOFA #18).

As to the first alleged omission regarding his ownership of Crown, Crafton does not dispute that his ownership of Crown was not listed. As to the second alleged omission regarding the existence of this lawsuit, Crafton does not dispute that the lawsuit was not listed. As to the final alleged omission regarding the names of businesses in which Crafton was an officer, Crafton alleges that he did provide the requested information. Such information read:

---

[7] Smith is not a creditor in the Craftons' Bankruptcy Case; therefore, Smith cannot demonstrate detrimental reliance on the alleged omissions and cannot assert equitable estoppel. *See id.* (noting that the party asserting estoppel did not rely on the alleged omission from a bankruptcy schedule and that the doctrine of equitable estoppel was therefore not available).

| <u>Name</u> | <u>[Id. Number]</u> | . . . | <u>Nature of Business</u> | <u>[Dates]</u> |
|---|---|---|---|---|
| "Self-Crown transportation" | 5575 | | Independent Trucker | 2002 to Jan 2005 |

(*Id.*) Smith argues that this information was not sufficient to identify Crown as a corporation but instead indicates that Crown was a sole proprietorship.

After consideration of the factors and relevant case law, the Court declines to exercise judicial estoppel to prevent Crown from proceeding with this lawsuit. The first factor does not weigh in favor of estoppel because the debtor in the bankruptcy proceeding and the plaintiff in this lawsuit are two different entities. Crafton and his wife filed Chapter 13 bankruptcy and made the alleged omissions as individuals. Crown, a corporation owned by Crafton, filed this lawsuit. As a general rule, it must be the same party asserting the allegedly "inconsistent positions" in order for judicial estoppel to apply. *See Johnson*, 405 F.3d at 1068 (stating that "a party's later position must be clearly inconsistent with its earlier position"); *Pennycuff v. Fentress County Bd. of Educ.*, 404 F.3d 447, 452 (6th Cir. 2005) ("Judicial estoppel forbids a party from taking a position inconsistent with one successfully and unequivocally asserted *by that same party* in an earlier proceeding.") (emphasis added) (quotation omitted); *Newfield Exploration Co. v. Applied Drilling Tech., Inc.*, No. 01-2746, 2003 WL 23253, at *7 (E.D. La. Jan. 2, 2003) (explaining that "the party taking the inconsistent position must be the same in each case"). This fact distinguishes the case from the principal case relied on by Smith, *Autos, Inc. v. Gowin*, No. 05-3415, 2007 WL 2269443 (10th Cir. Aug. 9, 2007) (unpublished), in which the bankruptcy debtor omitted to list a claim and then filed an adversary proceeding asserting such claim within the bankruptcy proceeding.

In the only case located by the Court presenting the factual scenario presented here, the court held that judicial estoppel did not apply to prevent a corporation from bringing an action based on the corporate president's failure to list the lawsuit in his previous, individual bankruptcy proceeding.

*See MTW Investment Co. v. Alcovy Props., Inc.*, 491 S.E. 2d 460, 466 (Ga. Ct. App. 1997). Further, the court held that the party asserting estoppel had not shown that the suing corporation was merely the alter ego of the individual involved in the bankruptcy proceeding. *Id.* In this case, there are no allegations or proof that Crown was merely the alter ego of Crafton or any other contention that Crafton and Crown should be considered the same entity simply because Crown is a solely owned corporation.

Even assuming Crafton and Crown should be considered the same entity for estoppel purposes, the first factor still does not weigh in favor of estoppel. Crafton did not take a position in his Bankruptcy Case that is "clearly inconsistent" with (1) Crown's filing of this lawsuit, or (2) a specific position taken by Crown in this lawsuit. Crafton was asked on his Bankruptcy Petition to identify any lawsuits in which "the debtor" was a party, not the debtor and any corporation in which he has an interest. Therefore, Crafton had no obligation to list this lawsuit nor did he make any statement that was inconsistent with filing this lawsuit. *Cf. United States v. Cimino*, No. 93-10326, 1994 WL 384299, at *3 (9th Cir. July 22, 1994) (holding that individual could not be prosecuted for bankruptcy fraud for failing to list personal assets because it was a corporate, and not an individual, bankruptcy proceeding). Nonetheless, Smith argues that Crafton's failure to list this lawsuit warrants estoppel because Crafton *also* failed to make proper disclosures regarding his ownership of Crown and its existence as a separate entity, citing *In re Arbaney*, 345 B.R. 293 (Bankr. D. Colo. 2006). In *Arbaney*, the court held that, although it was "good practice" for an individual debtor to list assets owned by a solely owned corporation, it was not fraudulent to omit them. *Id.* at 310. However, the court also stated that the failure was not fraudulent in that case because "the existence of the corporation [was] clearly disclosed on the schedules." *Id.* Smith uses

9

this language from *Arbaney* to argue that Crafton's failure to clearly disclose the existence of the corporation, combined with the failure to list the lawsuit, warrants estoppel.

The flaw in Smith's argument is that *Arbaney* is a case about whether a debtor committed fraud on the bankruptcy court. The issue in this case is whether Crafton took positions in the bankruptcy case that are "clearly inconsistent" with those taken in this lawsuit, such that he has improperly manipulated the judicial system. The Court finds that Crafton has not done so. It is not entirely clear to the Court that Crafton made misrepresentations regarding his ownership in or the corporate status of Crown, given that Crown was not a viable corporation for at least some period of time during this lawsuit and the Bankruptcy Case. Further, it is not particularly relevant in this case whether Crafton did or did not own stock in Crown or whether Crafton should have been more clear in his disclosures that Crown was a corporation rather than a sole proprietorship. The only issues presented are whether Crown or Smith breached agreements to one another, and it is not disputed that Crown is now a viable corporate entity. Accordingly, as to the first element, the Court concludes that different parties made the allegedly inconsistent statements. The Court further finds that there were no statements made by Crafton in the Bankruptcy Petition that are clearly inconsistent with positions taken by Crown in this lawsuit.

The second inquiry turns on whether the party opposing estoppel succeeded in persuading a court to accept that party's earlier position. Even assuming Crafton and Crown should be considered the same party for purposes of this analysis, it is not clear that Crafton conclusively "succeeded" in persuading the bankruptcy court to accept his earlier position that no lawsuit existed. The Bankruptcy Appellate Panel for the Tenth Circuit has held that, in a situation where a bankruptcy case can be reopened to allow listing of the lawsuit as an asset, a debtor has not

"succeeded" in any manner that cannot be remedied because "creditors will be notified of . . . recovery of assets and they will have the opportunity to file claims." *See Riazuddin*, 363 B.R. at 186. In this case, Crafton has already amended his Schedule B and SOFA to reflect the existence of this lawsuit and has notified the Trustee of its existence. Although an Order Confirming Plan has already been entered, Crafton's creditors are now aware of the claim and, assuming Crafton personally benefits from the lawsuit, his creditors will be allowed to file claims. *See id.* (noting that the final decree in bankruptcy has no "permanent legal effect on the rights of any creditors or any other party"). *But see Barger v. City of Cartersville, Ga.*, 348 F.3d 1289, 1297 (11th Cir. 2003) (reasoning that willingness to reopen bankruptcy proceeding is not sufficient to avoid judicial estoppel because it suggests that debtor should disclose assets only if he is caught concealing them); *Autos, Inc. v. Gowin*, No. 05-3415, 2007 WL 2269443, at *5 (10th Cir. Aug. 9, 2007) (unpublished) (holding that a debtor "succeeded" in persuading bankruptcy court to accept her position that she did not have claims against a creditor that she later sued in an adversary proceeding within the bankruptcy case). Accordingly, under published Tenth Circuit law, the second factor does not seem to weigh in favor of estoppel.

The third element inquires whether the party opposing estoppel will receive an unfair benefit or whether the party asserting estoppel will suffer an unfair detriment. Obviously, Smith will not suffer any unfair detriment because it is not a creditor and has no interest in the Bankruptcy Case. At most, Smith "will be denied the windfall it had hoped to receive by avoiding further litigation and any potential liability on the claim." *Riazuddin*, 363 B.R. at 187. Likewise, Crown will not receive any unfair advantage because it is also not a party to the Bankruptcy Case. Crafton could have received an unfair monetary advantage to the extent Crown recovered from Smith, the proceeds were

11

distributed to Crafton individually, and Crafton's creditors in the Bankruptcy Case had no knowledge of Crafton's recovery. However, any potential unfair monetary advantage has been remedied by amendment of Crafton's Bankruptcy Petition to disclose the lawsuit. It is true that Crafton did receive a non-monetary benefit to the extent his omitted disclosures "would have assisted the [bankruptcy] judge in making fully informed decisions about the bankruptcy plan and would have enabled creditors, who relied upon the schedules, to take the appropriate course of action." *See Autos, Inc. v. Gowin*, 330 B.R. 788, 796 (D. Kan. 2005) (holding that "the impact of a debtor's nondislcosure must be measured in more than monetary terms because it affects creditors' willingness to negotiate their claims and enhances the debtor's bargaining position by making the pot that creditors look to for recovery appear smaller than it really is") (quotation omitted), *aff'd in relevant part by Autos, Inc. v. Gowin*, No. 05-3415, 2007 WL 2269443 (10th Cir. Aug. 9, 2007) (unpublished). However, this advantage by Crafton is not sufficient for this factor to weigh in factor of applying estoppel against Crown in this case.

Finally, the Court adopts the Tenth Circuit Bankruptcy Appellate Panel's reasoning that it is appropriate to consider the interests of the creditors in the Bankruptcy Case. *See Riazuddin*, 363 B.R. at 187. Assuming Crafton, as an individual, will potentially benefit from this lawsuit asserted by Crown, the "real harm" of applying judicial estoppel would fall on Crafton's creditors. *Id.* Although the Court understands that judicial estoppel is concerned with protecting the integrity and truthfulness of the judicial system, it makes little sense to apply the doctrine in a way that "punish[es] those whom the truthful disclosure of assets is intended to benefit." *Id.* As reasoned by the panel, the debtor's non-disclosure harms his creditors once and then "completes the job" by denying creditors even the right to seek some share of the recovery. *Id.* (citing *Biesek v. Soo Line*

*R.R. Co.*, 440 F.3d 410, 413 (7th Cir. 2006)). Applying the relevant factors and considering the interest of Crafton's creditors, the Court declines to apply judicial estoppel to preclude Crown's lawsuit.

### B. Applicability of TLA Regulations

Under federal law, motor carriers are required to register with the Department of Transportation ("DOT") in order to ship most types of cargo in interstate commerce. *See* 49 U.S.C. §§ 13901, 13902; 49 C.F.R. § 367.4; *Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co., Inc.*, 367 F.3d 1108, 1110 (9th Cir. 2004). These registered carriers are statutorily obligated to comply with certain regulations promulgated by the DOT. 49 U.S.C. § 13902(a)(1); 49 C.F.R. § 367.7. "A primary goal of this regulatory scheme is to prevent large carriers from taking advantage of individual owner-operators due to their weak bargaining position." *Swift Transp. Co.*, 367 F.3d at 1110. "For example, the statute authorizes the DOT to require that all leases between motor carriers and owner-operators be in writing and contain certain basic information, such as the duration of the lease and the compensation to be paid the owner-operator." *Id.* (citing 49 U.S.C. § 14102(a) and relevant regulations).

TLA Regulations were originally promulgated and enforced by the Interstate Commerce Commission. *Id.* When Congress abolished the Commission in 1995, "it placed enforcement responsibility with the owner-operators by enacting a statute that provides a private right of action." *See id.* (citing 49 U.S.C. § 14704(a)). The statutory bases for TLA Regulations are 49 U.S.C. § 13301 (authorizing the "Secretary to prescribe regulations to carry out this part") and 49 U.S.C. § 14102 (providing that the "Secretary may require a motor carrier providing transportation . . . that uses motor vehicles not owned by it" to, *inter alia*, have a written agreement with the owner). *See*

13

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Mayflower Transit, Inc.*, 161 F. Supp. 2d 948, 953-54 (S.D. Ind. 2001). Because they are authorized by statute and properly promulgated, TLA Regulations carry the force of law. *Id.* at 955.

Under TLA Regulations, in order for an "authorized carrier" to "perform authorized transportation in equipment it does not own," it must enter into "a written lease granting the use of the equipment and meeting the requirements contained in § 376.12." 49 C.F.R. § 376.11(a).[8] A "lease" is defined in the regulations as a "contract or arrangement in which *the owner* grants the use of equipment, with or without a driver, for a specified period to an *authorized carrier* for use in the regulated transportation of property." *Id.* § 376.2(e) (emphasis added).[9] "Owner" is defined as "[a] person (1) to whom title to equipment has been issued, or (2) who, without title, has the right to exclusive use of equipment, or (3) who has lawful possession of equipment registered and licensed in any State in the name of that person." 49 C.F.R. § 376.2(d).[10]

---

[8] "Equipment" is defined as "[a] motor vehicle, straight truck, tractor, semitrailer, full trailer, any combination of these and any other type of equipment used by authorized carriers in the transportation of property for hire." 49 C.F.R. § 376.2(b).

[9] Similarly, under the section governing lease requirements, under the subheading "Parties," the regulations provide that "[t]he lease shall be made between the *authorized carrier* and the *owner* of the equipment." *Id.* § 376.12 (emphasis added).

[10] Crown does not seem to be the typical "owner-operator" who is protected by TLA Regulations because it is not an individual driver who owns a truck, leases the truck to authorized carriers, and then operates the truck in interstate commerce. *See Swift Transp. Co., Inc.*, 367 F.3d at 1110 (noting that "[t]here are hundreds of thousands of *owner-operators* in the United States, many of whom contract with various federally regulated motor carriers" and that a "primary goal of this regulatory scheme is to prevent large carriers from taking advantage of *individual owner-operators* due to their weak bargaining position") (emphasis added). Nonetheless, the Court is bound to apply the statutory language, and the phrase "owner-operator" does not appear in the TLA Regulations. Instead, the regulations use the word "owner," as defined above. Nor does the Court find anything in the regulations requiring that Crown (by and through its employees) actually operate the leased equipment in order for the lease to be covered. *See* 49 C.F.R. § 376.2(e) (defining a "lease" as a "contract or arrangement

14

For purposes of this motion, it is not disputed that (1) Smith is an authorized carrier; (2) Crown was an "owner" of at least one truck and about twenty trailers at the time of entering the Agreement; and (3) Crown leased equipment from others, which it then planned to lease to Smith. Smith framed the issue as whether the one vehicle owned by Crown upon commencement of the Agreement was or was not exempt pursuant to 49 C.F.R. § 376.21(b), which exempts any "[e]quipment used in transportation performed exclusively within any commercial zone as defined by the Secretary." Smith relies on deposition testimony purportedly standing for the proposition that this truck only operated within one commercial zone both before and after the Agreement. Crown argues that it is not proper to limit the analysis to equipment owned at the time the Agreement was entered because TLA Regulations "apply to every instance where an authorized carrier seeks to operate equipment it does not own." (Pl.'s Resp. to Def.'s Mot. for Summ. J. 9.) Crown contends that "numerous additional pieces of equipment were leased to Smith including more Plaintiff owned trailers and even trucks which Smith or its alter ego factoring company sold to Plaintiff as well as additional . . . equipment which Plaintiff had exclusive dominion and control and was leased to Smith." (*Id.* 9-10.) In its reply, Smith does not directly address the issue of whether the only relevant equipment is that owned by Crown at the time the Agreement was entered, or whether it is all equipment leased by Smith from Crown during the life of the Agreement.

As an initial matter, the Court concludes that the proper issue is not limited to whether Crown was an owner of any non-exempt equipment at the time the Agreement was entered. The

---

in which the *owner* grants the use of equipment, *with or without a driver*, for a specified period to an authorized carrier for use in the regulated transportation of property") (emphasis added). Thus, the fact that Crown is not a typical "owner-operator" is not conclusive.

issue is whether Crown was an owner of any non-exempt equipment leased by Smith during the entire span of the Agreement. The Agreement was clearly intended to govern any and all equipment Crown leased to Smith during the life of the Agreement, not just that equipment then-owned by Crown. (*See* Am. Compl., Ex. A ("SST agrees to lease equipment from Crown that Crown has the authority to lease to SST.").)[11] If, during the course of the Agreement, Smith leased from Crown equipment that was "owned" by Crown, *see* 49 C.F.R. § 376.2(d), and that was not otherwise exempt, *see id.* § 376.21, such equipment could only be leased in compliance with TLA Regulations. Thus, the Court concludes that Crown is entitled to present evidence at trial regarding any equipment leased to Smith during the course of their business relationship, rather than merely equipment owned by Crown at the time of entering the Agreement.[12]

In light of the Court's framing of the issues, there are disputed questions of fact precluding summary judgment. First, Smith has not presented any evidence regarding Crown's ownership, or non-ownership, of equipment leased to Smith after the commencement of the Agreement. Therefore, it is not entitled to judgment on Crown's claims for regulatory violations. Second, the record does not support a finding, at this stage of the proceedings, that Crown was not an "owner" of any equipment it leased from others and then leased to Smith. As explained above, "ownership" under TLA Regulations is a term of art that includes individuals who lack title but have the "right to exclusive use." 49 C.F.R. § 376.2(d). Crafton testified that "Crown entered into agreements with

---

[11] Indeed, Crown contends that Smith leased numerous pieces of equipment other than those owned or leased by Crown at the time the parties entered the Agreement.

[12] There was a limited amount of briefing on this issue, which is obviously important to the scope of trial. If either party wishes to assert further argument or authority on this issue, it should be prepared to do so prior to trial.

[various] equipment owner[s] under which Crown was *granted exclusive use* of the equipment and we, in turn, leased this equipment to Smith like our Crown titled equipment, for use by Smith under Smith's authorities." (Crafton Aff. ¶ 4) (emphasis added).) Despite Smith's contentions to the contrary, the Court finds the record evidence inconclusive as to the precise relationship between Crown and the drivers of equipment leased by Crown (and then leased to Smith) and the degree to which Crown had possession and/or rights to exclusive use of the leased vehicles. *See Bonkowlski v. Z Transport, Inc.*, No. 00-C-5396, 2004 WL 524723, at *2 (N.D. Ill. March 5, 2004) (concluding, following a bench trial, that an individual trucker was an "owner" of vehicle, despite his lack of title, because "during the period that the tractor was in his possession, he used it to the exclusion of all others"). Nor does the court's decision in *Bonkowlski*, cited by Smith, indicate that a lessee such as Crown could never be considered an "owner" of a vehicle. It simply indicates that, in that case, the individual driver's right to exclusive use was sufficient to qualify him as an "owner" of the vehicle.[13]

Finally, even were the Court to accept Smith's framing of the issue as whether the one vehicle owned by Crown at the commencement of the Agreement was exempt from TLA Regulations, there is a disputed question of fact as to this issue. Contrary to Smith's assertions, Crafton's deposition testimony is not conclusive as to whether such vehicle was used exclusively in one "commercial zone" both before and after the Agreement. *See* 49 C.F.R. § 376.21(b) (exempting "equipment used in transportation performed exclusively within one commercial zone"); *id.* § 372.241 (defining commercial zone as municipality and all contiguous municipalities); *id.* §

---

[13] Once the evidence is presented, Smith may have a persuasive argument that Crown did not have the "right to exclusive use" of any equipment it leased from others and then never operated. However, the Court cannot make such decision based on the record before it.

17

372.239(b) (defining contiguous municipalities as those which at some point have a common municipal boundary). Crafton did testify that the truck was a "city truck" and that its driver, Gary Coyle, loaded only "Tinker loads" and other loads in Oklahoma City, Oklahoma. (Crafton Dep., Def.'s Reply in Support of Mot. for Summ. J., Ex. 7 at 73:19-24.)[14] However, Crafton submitted an affidavit in which he clarified that he was describing Coyle's activities only for "the immediate period before the Smith lease." (Crafton Aff. ¶ 3.) In an attempt to prove that this was a "sham affidavit" that should be disregarded, Smith misquoted Crafton's deposition testimony in two different portions of its reply brief. Specifically, Smith represented that Crafton testified that "[Gary Coyle] was servicing a customer at Tinker *and* when we went with Smith." (Def.'s Reply 7 (emphasis added).) Again, on the next page of its brief, Smith argued:

> Likewise, Crown said in his deposition quoted above that Gary Coyle had been hauling "Tinker loads" before the deal with Smith, and then after the deal with Smith he started operating under Smith's authority; and that Coyle was "servicing a customer at Tinker[,] and when we went with Smith." (Emphasis added.) Crafton is trying to alter his remembrance, saying that Coyle quit doing the Tinker work immediately upon Crown entering into its contract with Smith. Crafton offers no explanation for either of these changes in his testimony.

(*Id.* 9 (all emphases in original).) The actual deposition testimony, which is attached to Smith's brief, reads, "He was servicing a customer at Tinker when we went with Smith." (Crafton Dep. 198:17-18.) Not only did Smith add the crucial word "and" to the deposition testimony, Smith emphasized the word "and" by underlining it for the Court. Not only does the Court reject Smith's argument that Crafton's affidavit and deposition are clearly inconsistent, the Court observes that Smith made blatant misrepresentations of Crafton's testimony in an attempt to prove this point.

---

[14] The reference to "Tinker" is to Tinker United States Air Force Base, which is located near Oklahoma City, Oklahoma.

For the reasons outlined above, Defendant's Motion for Summary Judgment (Doc. 39) is DENIED.

**ORDERED this 11th day of April 2008.**

**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**